FILED

03/08/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 18, 2018

## STATE OF TENNESSEE v. WILLIAM EARL CLARK, JR.

### Appeal from the Criminal Court for Knox County
### No. 103908B  Bobby R. McGee, Judge

_____

### No. E2018-00675-CCA-R3-CD

_____

A Knox County Criminal Court Jury convicted the Appellant, William Earl Clark, Jr., of aggravated robbery and drug and weapon offenses, and he received an effective eight-year sentence to be served in confinement. On appeal, the Appellant contends that the evidence is insufficient to support the aggravated robbery conviction. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk (on appeal) and Preston D. Pierce (at trial), Knoxville, Tennessee, for the appellant, William Earl Clark, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

Detective Brad Yearout of the Knox County Sheriff's Office (KCSO) testified that he worked undercover in the Narcotics Unit, buying and selling drugs. On April 16, 2014, the KCSO arranged a "reversal" drug buy in which Detective Yearout was to sell one pound of "high grade" marijuana to a drug dealer for $3,450. The transaction was to occur in the Food City parking lot on Clinton Highway near Merchants Road.

Detective Yearout testified that prior to the transaction, the drug interdiction team met in the nearby Expo Center parking lot to "debrief." Other officers were assigned to "cover the exits" of the Food City parking lot, and Detective Yearout was going to wear a "wire" so the officers could hear the transaction as it was occurring. Detective Yearout was to give the "good go word" to let the officers know the transaction was complete and they could arrest the buyer. If something went wrong, Detective Yearout was to give a different code word to let the officers know he needed help. Detective Yearout wore a holstered firearm on his hip but did not wear a bulletproof vest during the transaction.

Detective Yearout testified that a confidential informant (CI) was to introduce him to the buyer and that he did not know who was going to "show up" to buy the marijuana prior to the transaction. The CI met Detective Yearout in the Expo Center parking lot and drove him to the Food City parking lot. They were in a four-door vehicle, and Detective Yearout was sitting in the front passenger seat. The suspect vehicle, a white Denali, arrived in the Food City parking lot and pulled up to the CI's vehicle. The Appellant got out of the Denali and got into the driver-side back seat of the CI's vehicle. Detective Yearout explained as follows:

> I show Mr. Clark the pound of marijuana. We talk a little bit. Mr. Clark never put his legs inside the vehicle, so I felt that was very strange. He kept the door open in the back, so I felt a little nervous during the deal, but [I] kept on talking to him. He kept asking to see the marijuana. He wanted to hold it and hold it. And I was not going to give up the marijuana until the exchange of money[.]

Detective Yearout testified that he was looking over his left shoulder at the Appellant and that he held the vacuum-sealed bag of marijuana over his left shoulder so the Appellant could see it. The Appellant touched the bag and "pull[ed] on it a little bit." Detective Yearout moved the marijuana back to the front of the vehicle and asked if the Appellant had the money. At that point, the Appellant pulled a gun out of his pocket, pointed it at Detective Yearout, and said, "'Give me that shit.'" The Appellant "snatch[ed]" the marijuana out of Detective Yearout's hand and jumped out of the CI's vehicle. Detective Yearout stated, "I, actually under stress and, I guess, fear, jump[ed] out of the car and yell[ed] the good word and the bad word on the recording device."

Detective Yearout testified that the Appellant went to the passenger side of the Denali. By the time Detective Yearout got to the Denali, other officers were holding the Appellant at gunpoint and telling him to get on the ground. Detective Yearout went to the driver's side of the Denali and took the driver into custody. Officers later found a twenty-five-caliber semi-automatic pistol on the ground beneath the Appellant and a

second gun "in close proximity" to the driver. Officers searched the Appellant, the Denali, and the driver but never found any money.

Detective Yearout testified that the drug transaction was video recorded, and the State played the video for the jury. At the conclusion of Detective Yearout's testimony, the State asked him to describe "how that made you feel having that gun pulled on you." Detective Yearout answered, "That was the first time I ever had a firearm pointed at me. I was in fear for my life and scared. It took me several hours to finally let my adrenaline come down from that incident."

On cross-examination, Detective Yearout testified that this was the first time he participated in a reversal in which he worked undercover. He said that the Food City parking lot was "a known drug area" and acknowledged that a sergeant in the Narcotics Unit chose the parking lot for the drug buy.

Lieutenant James Hammond of the KCSO testified that he was a supervisor in the Drug Interdiction Unit. On April 16, 2014, members of the unit met in the Expo Center parking lot to plan "a reversal on a pound of marijuana." He said that the sheriff's office always used one pound of marijuana in a reversal because a pound "is usually used to be broke down and sold individually for resale," not personal use. Lieutenant Hammond's role in the April 16 transaction was to "set up" in the Food City parking lot so he could "keep an eye on the vehicle that Detective Yearout was in."

Lieutenant Hammond testified that he drove to the Food City parking lot and parked where he could see the CI's vehicle. A white Denali pulled up next to the vehicle, the Appellant got out of the passenger side of the Denali, and the Appellant got into the back of the CI's vehicle on the driver's side. Lieutenant Hammond had his police radio turned on, but another officer was listening to the drug transaction. Lieutenant Hammond saw the Appellant "take off around" and heard other officers say that "it's gone bad, it's gone bad." Lieutenant Hammond turned on his police siren, which startled the Appellant. The Appellant turned around, and Lieutenant Hammond drove his police car up to the Denali. Lieutenant Hammond jumped out of his car, demanded to see the Appellant's hands, and ordered the Appellant onto the ground. The Appellant got on the ground but never showed his hands.

Lieutenant Hammond testified that Detective Yearout came over to the Denali and said the Appellant had a gun. The Appellant was lying face-down in the parking lot, and officers handcuffed him. When the officers rolled him over, they saw a silver gun and marijuana on the ground.

On cross-examination, Lieutenant Hammond testified that he could see heads in the CI's vehicle during the transaction but that he could not see what was happening in the vehicle. The Appellant never put his hands up as Lieutenant Hammond ordered, and the Appellant's hands "stayed in front of him the whole time." After the police arrested the Appellant, Lieutenant Hammond did not find any baggies or scales.

Officer James Doran of the KCSO testified that in April 2014, he was a member of the interdiction team that participated in the Appellant's drug transaction. Officer Doran attended the meeting in the Expo Center parking lot and was to provide security for the transaction by making sure no one escaped the northwest side of the Food City parking lot. During the drug transaction, Officer Doran heard that something had gone wrong. He drove into the Food City parking lot and saw that officers were already around Detective Yearout and two vehicles. Officer Doran searched the driver's side of the suspect vehicle and found a black semi-automatic handgun on the driver's floorboard.

Donna Roach testified that she worked for KGIS, which was the Geographic Information System for Knoxville, Knox County, and the Knoxville Utilities Board (KUB). Roach prepared a map for this case, showing the Clinton Plaza Shopping Center on Clinton Highway. Two "daycare buffer zones" were on the map, and each buffer zone measured 1,000 feet around the daycare. A section of the shopping center fell within at least one of the buffer zones.

Ansley Taylor testified that she was employed by the State of Tennessee's Childcare Licensing Agency in Knox County. In April 2014, Wallace Memorial Childcare Center and Tate's Totz and Teens were operating as licensed daycare centers.

At the conclusion of Taylor's testimony, the jury convicted the Appellant as charged of the following offenses: count one, aggravated robbery; count two, possession of marijuana with intent to sell within 1,000 feet of a daycare; count three, possession of marijuana with intent to deliver within 1,000 feet of a daycare; count six, possession of a firearm during the commission of a felony involving the possession of a controlled substance with intent to sell; and count seven, possession of a firearm during the commission of a felony involving the possession of a controlled substance with intent to distribute.[1] After a sentencing hearing, the trial court merged count three into count two and count seven into count six. The trial court sentenced the Appellant as a Range I offender to eight years for aggravated robbery, the minimum punishment in the range for a Class B felony; one year for possession of marijuana with intent to sell within 1,000 feet of a daycare, the minimum punishment in the range for a Class E felony; and three years for possession of a firearm during the commission of a dangerous felony, the

---

[1] Counts four and five related to the Appellant's codefendant.

minimum punishment in the range for a Class C felony. The trial court ordered that the Appellant serve the three-year sentence consecutive to the one-year sentence pursuant to Tennessee Code Annotated section 39-17-1324(e)(1) but ordered that the Appellant serve the effective four-year sentence concurrently with the eight-year sentence for a total effective sentence of eight years.

## II. Analysis

On appeal, the Appellant contends that the evidence is insufficient to support his conviction of aggravated robbery because Detective Yearout did not say he gave the bag of marijuana to the Appellant as a result of the Appellant's threatening him with the firearm. Instead, the officer testified that the Appellant grabbed the bag from his hand. Therefore, "the taking of the marijuana was not accomplished by use of the firearm but rather by simply snatching the bag from [Detective] Yearout's hands," and the evidence is sufficient to support simple robbery but not aggravated robbery. The Appellant also contends that the evidence is insufficient to support the conviction because the video rebuts Detective Yearout's testimony that Appellant pointed a handgun at him. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions

primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated robbery is robbery "[a]ccomplished with a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

Taken in the light most favorable to the State, the evidence shows that the Appellant got into the back seat of the CI's vehicle but left the door open with his legs outside the vehicle. The Appellant's actions concerned Detective Yearout, but the officer proceeded with the drug buy. Detective Yearout showed the bag of marijuana to the Appellant, and the Appellant wanted to hold the bag. However, Detective Yearout refused and testified that "I was not going to give up the marijuana until the exchange of money." When Detective Yearout asked for the money, the Appellant pointed a gun at him, snatched the marijuana from his hand, and fled. Detective Yearout further testified that he was in fear for his life and scared. This evidence is sufficient to show that the Appellant took the marijuana while using a deadly weapon and placing Detective Yearout in fear and, therefore, is sufficient to support his conviction of aggravated robbery.

As to the Appellant's claim that the evidence is insufficient because the video does not show him with a gun, we have reviewed the video. The camera was mounted inside the front of the CI's vehicle and was pointed toward the backseat. However, most of the view of the back seat was obstructed by Detective Yearout and the CI. When the Appellant entered the CI's vehicle, he was only partially visible. Detective Yearout showed the marijuana to the Appellant and asked for "the cash," and the Appellant reached forward and grabbed the bag out of the officer's hand. Although a gun cannot be seen in the video, the jury chose to accredit Detective Yearout's testimony that the Appellant pointed a gun at him. Moreover, officers found a gun underneath the Appellant immediately after the robbery. Accordingly, the evidence is sufficient to support the conviction.

### III. Conclusion

- 6 -

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____

NORMA MCGEE OGLE, JUDGE